Testator, by a will made in 1879, bequeathed in trust a sufficient sum which, when invested at the rate of 6 per cent., "will produce the annuities hereinafter given." At that time the legal rate of interest was 7 per cent. *Held,* that the sum to be set aside by the executors in 1904 was the sum which, at 6 per cent., would produce them, and not the sum which, at the lower rate of interest prevailing, would produce them.

2. GIFTS INTER VIVOS—REALTY.

   The brothers and sisters of a decedent verbally agreed to give their mother their shares in his estate. He had died unmarried, and left an estate consisting of realty and personalty. *Held,* that his realty did not pass to the mother by the agreement, but to his heirs.

3. SAME—VALIDITY.

   Where the brothers and sisters of a decedent verbally agreed to give their interest in his estate to their mother, though the personalty might not pass under such an agreement, where there was an actual division of the personalty and a subsequent delivery by each child to the mother of his or her share, it passed as a gift inter vivos.

4. WITNESS—COMPETENCY.

   Where the brothers and sisters of a decedent verbally agreed to give all their interest in the estate to their mother, on an accounting by the executor of the mother, as administratrix of deceased, the brothers and sisters are not incompetent to testify as to the action of another brother, since deceased, in joining in the gift to the mother, under Code Civ. Proc. § 829, as interested in the event, because, as heirs of their mother, they may share in the property of such other brother.

5. GIFTS—PROPERTY CONVEYED.

   Where the brothers and sisters of a decedent verbally agreed to give all their interest in his estate to their mother, the surplus income paid to the mother in each year of her life passed to her, and need not be accounted for by her representative.

6. SAME.

   Where children of testator agreed to give all their interest in the estate of a deceased brother to their mother, and subsequently delivered to her their shares in his personalty, their interest in the deceased brother's share of the undivided estate of the testator did not pass to the mother, but to his heirs.

In the matter of the accounting of the estates of James Sproule, Sr., and of James Sproule, Jr. Decrees rendered.

George G. Reynolds, for H. C. M. Ingraham, executor of Mary Jane Sproule, executrix and trustee under the last will and testament of James Sproule, Sr., and administratrix of the estate of James Sproule, Jr., deceased.

I. R. Oeland, for Julie C. Sproule.

Henry C. Ingraham, for Charles H. Sproule, Presley Sproule, Jennie B. Cochran, and Daisy Sproule.

Charles H. Edgar, for Mary A. Milschsack.

CHURCH, S. The final accountings in the two above estates were brought on for hearing together, and the facts concerning the two matters were so blended together that by stipulation it was agreed that the two matters should be heard together, and the evidence ap-

ply to both proceedings. I shall, therefore, in one opinion, dispose of the two cases.

In the estate of James Sproule, Sr., the question is solely a question of law, involving the construction of the will of said deceased. By the terms of the will, after disposing of certain real and personal property to his wife and each of his children, he provided as follows:

"Sixth. I hereby give and bequeath to my executors hereinafter named, or to such one of them as shall act, a sufficient sum of money which when invested at the rate of six per cent. per annum will produce the annuities hereinafter given and bequeathed, to have and to hold the same in trust to and for the following uses and purposes, viz.: To invest and keep the same invested in such securities as my said executors or such one of them as shall act or the survivor of them shall deem best and most secure, to collect and receive the interest and income accruing from said money so invested and to pay the annuities hereinafter given to the persons and in the manner hereinafter described specifically."

Then follow a number of provisions stating the amount of the annuities to each person in question. At the time of the final accounting of the executors of said estate they reserved to themselves, as trustees, a sum far in excess of the sum which, at 6 per cent., would produce the annuities mentioned. It specifically appears, however, by the memorandum submitted on behalf of the parties and by the decree that the retention of such surplus sum by the executors was not to be deemed as judicially determining that it was the amount necessary to produce the annuities, and that it was only done for the convenience of all parties, and the counsel for the executor respectfully reserved the right to have the court pass upon the question of how much should be set aside to produce the annuities upon the death of any annuitant. The widow of James Sproule, Sr., having died, and two of the children having died, it becomes necessary to determine the amount that should be set aside under the above "sixth" paragraph of the decedent's will, and upon this point two contentions are advanced.

It is the contention of the executors that under the will of the testator an ample amount should be set aside so as to produce, beyond all peradventure, the annuities in question, even at the present reduced rate of interest, which is below that which prevailed at the time of the testator's death. The executrix of one of the deceased children contends, on the other hand, that the amount which should be set aside is the amount which, at 6 per cent., would produce the annuities in question. Counsel for the respective parties also contend that by previous orders made in the management of this estate this question has been practically decided, counsel for the executor contending that when an amount which was far in excess of the sum necessary to produce these annuities at 6 per cent. was reserved by the final decree settling the executor's accounts, that was, in effect, a determination that the total of such trust fund was not so limited. This contention does not seem to me, however, to be effective, as it appears that the counsel for the respective parties at the time this was done distinctly placed themselves on record that this amount was set aside by general consent and convenience of the parties, and was not to be deemed an adjudication or an estoppel which would prevent

them from thereafter contending as to what should be the proper amount. It seems to me that any order of a court, based upon such a statement as that, must be deemed to have that as the theory upon which the order was made, and that it cannot be looked upon as a direct adjudication against the interests of the parties so consenting. On the other hand, it appears that when James Sproule, Jr., died, the executors and trustees presented a petition to the court, setting forth that he had died; that the amount which they held to produce his annuity should be distributed; and in the petition they recited that the amount necessary to produce $1,200 at 6 per cent. was $20,000. Thereupon the court made an order that the $20,000 should be distributed. The contestant contends that the effect of such order is not only to estop the executors from contending that any larger sum should be retained, but also that the court, in making the order upon this basis, is presumed to have adopted that theory, and to have adjudicated that this was the amount which was to be held in trust under the terms of the will.

I do not regard this order as an adjudication which can be deemed binding upon the executors, or which I am bound to follow. It seems to me that it is entitled to considerable weight, as showing the theory upon which the counsel for the executors and trustees regarded this will, but it does not seem to me that it amounts to an estoppel of record which precludes the executors from now contesting the matter. Taking up this "sixth" paragraph of this will in question, therefore, it seems to me that when the testator directed that there should be given to the trustees a sum which, at 6 per cent., would produce the annuities in question, it was, in effect, a declaration of the precise amount of such trust fund, and that, having given the amount of the income and the rate of interest, the matter of determining the principal of the trust fund was simply a matter of calculation. Why the testator used this form of language instead of naming the amount of the trust fund we do not know, but it is not a question of whether, in the will in question, the way that the testator has expressed himself is the simplest and easiest under the circumstances, but what did the testator mean; and, if the testator meant that this was to be regarded as the limit of the trust fund, then that should be accepted by the court as a specific declaration to that effect, as fully as if he had mentioned it exactly in dollars and cents. To adopt this interpretation will give effect to all of the provisions of the will in question, except, of course, the contention of the annuitants that, as the rate of interest has fallen off, the amount of their income is depreciated. The answer to this is that this is the inevitable result of all trust funds, where, as in this country, the rate of interest has been steadily growing lower, and that that fact of itself is no reason why we should presume that the testator meant to make his trust fund any larger than he specifically stated. If, on the other hand, we should adopt the contention of the trustee that a sufficient sum must be set apart to produce the amount mentioned as annuities, having in mind the present rate of interest, which is so much below that which prevailed at the time of the testator's death, and looking to the future, and the probability that the rate of interest may become much lower, we have

to reject as absolute surplusage all of the provisions of the will providing that the sum of money is to be the amount which, invested at 6 per cent., would produce the annuities. We should, if possible, in construing a will, adopt that contention which gives effect to each provision of the will, and not assume that any language was used unnecessarily, rather than a contention which rejects the language contained therein.

But there are other objections to the contention of the trustees, which are even more forcible. If the testator intended that these annuitants should, during their entire lives, receive the amount of the annual annuity mentioned in his will, he would have then, instead of making a statement which involved a calculation, set apart a sum which would, at the probable reduced rate of interest which now prevails, produced such annuities, and his failure to do this shows that he did not regard the amount of the annuity as the important proposition. But, further, if this question which is raised now had been contested at the time of the final accounting of the executors, a short time after the testator's death, there is no question that the amount which the court at that time would have set aside would have been the amount which, at 6 per cent., would have produced these annuities. This will was drawn at a time when the legal rate of interest was 7 per cent., and when there was discussion over legislation reducing it to 6 per cent. This was consummated by the act passed in 1879 (but a few months after the testator's death), providing that on and after January 1, 1880, the legal rate of interest was 6 per cent., and no doubt the testator had in mind that, if a sum was put apart which at 6 per cent. would produce these annuitants, he was providing an ample trust fund, particularly as at the time it was possible to obtain 7 per cent. per annum. The court therefore would not have been warranted at that time in saying that the rate of interest might possibly diminish to 4 per cent., and that, therefore, the trust funds should be made one-third larger than stated by the testator. The mere fact that the parties did not press the question at that time does not seem to me to alter the view which the court at the present day should take of it, because, if the court should make this trust sum the amount which at the present time, at the prevailing rate of 4 per cent., would produce the amount of these annuities, then, if the decision of this question had been postponed another 10 years, when the rate of interest may possibly be reduced to 2 per cent., it could equally be urged upon the court at that time, as is urged now, that the amount of the trust fund should be the sum which, at 2 per cent., would produce these annuities. This is practically the trustees' argument. If that is sound, we then have the probability that the trust funds of this estate may, by different decisions made at different times, be three different amounts. The statement of this proposition seems to be a sufficient refutation of its soundness, as the amount of the trust fund is not the amount which the court might think ought to be put by, but the amount which the testator intended to be put by; and there can be no question that the testator never dreamed that there should be put by a sum which, at 2 per cent., would produce these annuities. The amount of the annuities referred to, for purpose of calculation at the present time, is

$5,600. It therefore follows that $93,304 should be held by the trustee, to be invested for the five remaining children, and the remainder should be distributed as a portion of the residuary estate of the testator.

It is contended that an administrator with the will annexed should be appointed to distribute this fund. This seems to me entirely unnecessary. The parties are all before the court. The trustee having possession of the amount of this fund in excess of that indicated can distribute the same to the parties interested therein in pursuance of the decree to be entered herein.

The question in the estate of James Sproule, Jr., arises upon the following facts: It appears that James Sproule, Jr., died unmarried and intestate. Immediately after his death his mother, Mary Jane Sproule, called her various children, brothers and sisters of James Sproule, Jr., together, and stated, in substance, "that Jimmie intended to make a will in her favor," and that she thought that the children should give the proportion of his estate to which they were entitled to her. To this arrangement all of the children consented, except a partial reservation by the son Charles. The question is, therefore, what was the legal effect of this agreement upon the estate of James Sproule, Jr., and how the various parties to that agreement are affected thereby? For the purpose of considering this agreement, it may be first wise to examine the character of the property or estate left by James Sproule, Jr., and this, for convenience, may be subdivided into four different classes: First. Real estate owned by James Sproule, Jr. Second. Personal property, consisting of railroad bonds and other collateral, which was kept by James Sproule, Jr., in a separate envelope in the family safe deposit box. Third. The interest which he possessed in the undivided estate of his father, James Sproule, Sr. Fourth. The surplus income which he was receiving from the trustees after they paid the annuities under the will of James Sproule, Sr. Considering this in the order in which they are stated:

First. It is self-evident that this agreement was insufficient to transfer the real estate owned by James Sproule, Jr., and as, under the statute, his mother was entitled to the entire income from the same, it follows that the amount which she has received was only that to which she was legally entitled, and that the real estate is therefore to be divided among his heirs at law.

Second. I am inclined to think that this conversation, or agreement, if you may dignify it as such, would be insufficient, without further action, to transfer the title of the personal property from the various heirs of James Sproule, Jr., to their mother, Mary Jane Sproule. But it is unnecessary to decide this question definitely, as it appears that shortly after the agreement in question the various heirs met at the safe deposit company which contained the collateral of James Sproule, Jr.; that they thereupon proceeded to divide the collateral among the various children in the proportion to which they were entitled to the same, and following such division each child delivered to the mother, Mary Jane Sproule, such child's share. Thus a complete gift inter vivos was effected. This transaction is established by the testimony of several of the surviving children of Mary Jane

Sproule.. The counsel for the contestant objected to the admission of such evidence, and contends that it was improper, and within the prohibition of section 829 of the Code. It did not seem to me on the trial that it offended against the provisions of the Code, and I therefore admitted the same. I have examined the question further since the submission of the case, and it seems to me that my ruling at the time of the trial was correct. The conversation is in the nature of a declaration by these witnesses as to the action of Adam Sproule, who is now dead. It is not in a proceeding in Adam Sproule's estate, nor did it concern any gift to them. The fact that by the subsequent trend of events they may possibly become entitled as next of kin and heirs at law of their mother's estate to a portion of such property does not seem, in my judgment, to make them parties interested in the event within the meaning of section 829 of the Code. Burley v. Barnhard, 9 N. Y. St. Rep. 587.

Third. As I have indicated, the agreement which was made between the brothers and sisters of James Sproule, Jr., and their mother does not seem to me to have been sufficient in itself to transfer the title of personal property to her, or to effectuate a gift of the same; and the fact that there was no attempt to make any transfer of the undivided share of James Sproule, Jr., in the estate of James Sproule, Sr., as they did with the collateral which he possessed, is evidence to my mind that all that agreement was intended to cover was the actual collateral security which he had in his possession. This is further strengthened by the fact that it was the contention of Adam Sproule, one of the parties to this transaction, that what the children did was to give to their mother the use of James Sproule, Jr.'s, estate, which statement was made in the presence of Mary Jane Sproule, and not denied by her, and that on one other occasion she herself had volunteered the same statement. Whether this was the result of a subsequent and more definite conversation, or whether this was the interpretation which the parties put upon the original conversation, does not appear, but it seems impossible, as I have said before, to hold that the informal conversation had shortly after James Sproule, Jr.'s, death was sufficient to transfer his undivided interest in the estate of his father, and therefore I shall hold that such undivided interest was not transferred to Mary Jane Sproule, and that James Sproule, Jr.'s, next of kin and heirs at law are entitled to the same. It necessarily follows that the payments on the sale of real estate and other property were improper.

Fourth. It appears without question that each year the surplus income of the estate of James Sproule, Sr., was divided into seven portions, and 'the portion which should have gone to James Sproule, Jr., was paid to his mother, Mary Jane Sproule. It is apparent that this was paid to her without objection or restrictions, and that it was paid to her for her own use, as indicated by the fact that during all the years which have elapsed since the death of James Sproule, Jr., no attempt has ever been made to ask her to account for the same as the administratrix of James Sproule, Jr. In view of the evidence introduced by the contestant here, that the parties agreed that the mother should have the use of James Sproule, Jr.'s, share during her lifetime, it seems to me that this money was paid to her in pursuance of this

understanding, and, being the income or the amount which his share of the same would produce, that, therefore, she was legally entitled to the same, and that, therefore, her executors should not be required to account for the same as a portion of the estate of James Sproule, Jr.

Let separate findings and decrees be presented in each estate, disposing of the controversy in accordance with the provisions of this opinion

Decreed accordingly.